1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11

SAHEL ONCOLOGY, LLC

Case No. 23-cv-1458-BAS-DDL

12

                            Plaintiff,

**ORDER**

13

   v.

14

STA PHARMACEUTICAL HONG
KONG LIMITED,

15

16

                            Defendant.

**1. GRANTING
   DEFENDANT'S REQUEST
   FOR JUDICIAL NOTICE
   (ECF NO. 28-2), and**

17

**2. GRANTING IN PART AND
   DENYING IN PART
   DEFENDANT'S MOTION
   TO DISMISS THE FIRST
   AMENDED COMPLAINT
   (ECF No. 28-1)**

18
19
20
21
22

     Presently before the Court is Defendant STA Pharmaceutical Hong King Limited's

23

("STA" or "Defendant") Motion to Dismiss the First Amended Complaint of Plaintiff

24

Sahel Oncology ("Sahel" or "Plaintiff").  (ECF No. 28-1 ("MTD").)  Defendant moves to

25

dismiss on the grounds that Plaintiff fails to plead a claim upon which relief may be

26

granted.  (*Id.*)  Sahel opposes.  (ECF No. 29 ("Resp.").)  Defendant replies.  (ECF No. 30

27

("Reply").)  Defendant additionally requests judicial notice of eleven exhibits attached to

28

its motion to dismiss.  (ECF No. 28-2.)  Plaintiff does not oppose.

The Court finds the motions suitable for determination on the papers submitted and without oral argument. Fed. R. Civ. P. 78(b); Civ. L.R. 7.1(d)(1). For the reasons set forth below, the Court **GRANTS** Defendant's Request for Judicial Notice (ECF No. 28-2), and **GRANTS IN PART** and **DENIES IN PART** Defendant's motion to dismiss the First Amended Complaint ("FAC") (ECF No. 28-1).

## I.   BACKGROUND

This case concerns a written contract between two companies to develop and manufacture a new cancer drug. Sahel brings claims under multiple theories of liability: alleging the contract as written is invalid, or one of its provisions is invalid, or the contract is valid but STA breached it. For these claims, Sahel seeks damages. Sahel also seeks reformation of the contract via declaratory relief on the grounds of equitable estoppel or unconscionability.

Plaintiff Sahel Oncology ("Sahel" or "Plaintiff") develops drugs for cancer patients and has its principal place of business in California. (ECF No. 27 ("FAC") ¶¶ 1, 5.) It has over eight years of experience in "experimental therapeutics" in this field, which includes the design of "several clinical trials, including trials to treat patients with brain cancer." (*Id.* ¶ 6.) STA is a pharmaceutical contract development and manufacturing company with its principal place of business in China. (*Id.* ¶¶ 2, 7.)

<u>Contract negotiations</u>. The parties entered into the relevant written contract on or around June 6, 2023. (FAC ¶ 9.) In the contract, STA agreed to manufacture and produce a cancer-fighting compound developed by Sahel. (*Id.*)

Sahel entered into this contract because it was attempting to manufacture its drug for a terminally ill cancer patient who "urgently needed" it. (*Id.* ¶ 11.) STA was aware of this during contract negotiations. (*Id.*) Ultimately, after the parties entered into the written contract, STA did not deliver the drug according to the approximate timetable in the contract and, to this Court's knowledge, still has not delivered it. (*Id.* ¶ 28.)

The parties dispute STA's representations and their meanings during the contract negotiation period. Sahel alleges two main misrepresentations by STA. First, Sahel alleges

that "STA represented to Sahel it would source the required API (Active Pharmaceutical Ingredient) for the manufacture of the new drug in 8 weeks or less." (*Id.* ¶ 12.) Second, Sahel alleges STA represented that it would produce enough of the drug and of a sufficient quality that it could be used on the cancer patient within a two- to three-month period after the parties signed the contract. (*Id.* ¶¶ 11, 13–14.) The contract contradicts this, though, and Sahel admits that the contract itself states that the first batch would be produced under GLP[1] conditions, which are not suitable for use on humans. (*Id.* ¶ 15.)

Although the contract's language contradicts Sahel's allegations regarding STA's second misrepresentation, Sahel alleges that language does not reflect the understanding of the parties when they agreed to the contract. When Sahel attempted to change the contractual language to require the first phase of drug manufacturing to be of a sufficient quality for emergency compassionate use, STA told it that the agreement "was its standard form contract, that Sahel could not change it, and Sahel needed to sign it in the form presented (i.e. with the first batch[] produced under GLP conditions)." (*Id.* ¶ 19.) While Sahel tried to change the language away from manufacturing the first batch of the drug under GLP conditions, Sahel also argues that STA misled Sahel to believe that the GLP conditions would suffice for Sahel's planned emergency compassionate use. (*Id.* ¶¶ 16–18.) Sahel further alleges that, were it not for these misrepresentations, Sahel would not have entered into the contract in the first place. (*Id.* ¶ 10.) It only entered into the contract in reliance on STA's promises and misrepresentations. (*Id.*) According to the FAC, STA used Sahel's urgency in procuring the drug to "lure[] Sahel into signing a contract which contained form, boiler-plate terms that differed from what STA had promised." (*Id.* ¶ 21.)

Contract terms. As already noted, the FAC alleges the terms as written in the contract do not reflect the agreement reached by the parties. The twenty-one-page contract is filled with timelines, assumptions, and industry terms.

---

[1] "GLP" stands for "Good Laboratory Practices." (FAC ¶ 15 n.2.)

First, according to the contract, STA was responsible for "sourc[ing] and purchas[ing] the required quantity" of the active pharmaceutical ingredient with the necessary safety and quality certifications. (ECF No. 28-4 at 7.)  In the contract, the parties *estimated* sourcing the active pharmaceutical ingredient would take two months, and Sahel agreed to pay for the substance at "actual cost."  (*Id.* at 4.)  The contract makes clear, however, that if a material like the active pharmaceutical ingredient "is not commercially available," then Sahel could either supply the material at its expense or amend the agreement "to permit the use of a commercially available substitute." (*Id.* at 15.)

Second, STA agreed to manufacture Sahel's drug in two phases.  Initially, STA was to produce a toxicology and engineering batch of the drug, which would be "non-GMP"[2] and used for "microbiological test methods verification and defective rate information." (*Id.* at 5.)  There was no suggestion in the contract that this first batch would be used in humans.  STA further agreed to later produce a "GMP"[3] drug batch after using a "Class C clean room for solution preparation" and taking other precautions.  (*Id.* at 6, 10.) In contrast to the first batch, this second batch was to be used for "clinical supplies." (*Id.* at 6.)

Third, the contract required STA to provide periodic progress updates to Sahel via team meetings.  (*Id.* at 7.)  The frequency of the updates was to be determined at the project kickoff meeting, and STA was to provide a written update to Sahel prior to each project update meeting.  (*Id.* at 14.)

The contract includes a confidentiality clause that states the parties will "maintain the Confidential Information in confidence."  (*Id.* at 18.)  This section of the contract has

---

[2] "Non-GMP" production here means GLP production.  (FAC ¶ 16.)

[3] The Court briefly touches upon the contract's use of "GMP" and "GLP" when describing the manufacturing services.   The contract incorporates the Food, Drug, and Cosmetic Act's good manufacturing practices ("GMP") for producing drugs.  (*See* ECF No. 28-4 at 7 (defining GMP to include "current good manufacturing practices and regulations . . . that are promulgated by any competent government authority").)  These GMP requirements assure that a drug meets safety criteria "and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess."  21 U.S.C. § 351(a)(2)(B).  If a drug is not made under GMP conditions, then the law deems it "adulterated."  *Id.*

23cv1458

1   been modified and the duration of the confidentiality provision, per the redline, was

2   extended from five to seven years.  (*Id.*)

3       <u>Performance</u>.   As part of the contract, Sahel agreed to share its proprietary

4   technology for the new drug with STA soon after the contract was signed, and it did so just

5   six days after signing, on June 12, 2023.  (FAC ¶ 9.)  In sharing this technology, Sahel

6   hoped to spur STA "to quickly produce the new drug for Sahel."  (*Id.*)  The contract also

7   required an initial payment of $134,550, which Sahel paid to STA.  (*Id.* ¶ 23.)

8       Soon after the parties entered into the contract, Sahel alleges the parties met on one

9   or two occasions.  In the first meeting, Sahel claims that, on June 19, 2023, just seven days

10  after it allegedly shared its technology with STA, "STA presented a proposal to Sahel

11  where it demanded that Sahel pay an additional $178,000 before it would proceed with the

12  work" eliminating the Toxic/Engineered batch phase.  (*Id.* ¶ 26.)  This additional payment

13  was outside of the contract's written terms and Sahel considered it to be a type of extortion.

14  In the second meeting, perhaps taking place several weeks later, Sahel alleges STA

15  suggested that the first batch (the GLP batch) could be eliminated altogether and STA could

16  proceed directly to the GMP phase.  (*Id.* ¶ 25.)  It is unclear from the FAC whether these

17  two meetings were in fact one and the same, and, if they were two distinct meetings,

18  whether STA requested additional payment at each of them.

19      Sahel also alleges breach of contract by STA's failure to perform on the parties'

20  contract.  Sahel alleges STA breached by failing to source and purchase the active

21  pharmaceutical ingredient within eight weeks as required by the contract.  (*Id.* ¶ 29.)  Sahel

22  alleges that STA told Sahel it could not source the active pharmaceutical ingredient because

23  it cost far too much, but when Sahel investigated this claim it found that it could acquire

24  the active pharmaceutical ingredient for 1.25% of the cost quoted by STA.  (*Id.*  ¶ 30.)

25  Sahel also alleges STA breached the contract by refusing to share information related to

26  the sourcing and acquisition of the active pharmaceutical ingredient, and by STA's failure

27  to provide progress reports to Sahel on the project.  (*Id.* ¶ 31.)  Sahel further alleges STA

28

breached the contract by violating the contract's confidentiality clause regarding Sahel's technology because STA has begun "advertising Sahel's technology on its website." (*Id.*)

## II.   REQUEST FOR JUDICIAL NOTICE

> [W]here a defendant attaches extrinsic evidence to a Rule 12(b)(6) motion, the court ordinarily must convert that motion into one for summary judgment under Rule 56 to give the plaintiff an opportunity to respond.  Where, however, an attached document is integral to the plaintiff's claims and its authenticity is not disputed, the plaintiff obviously is on notice of the contents of the document and the need for a chance to refute evidence is greatly diminished.

*Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), *as amended* (July 28, 1998) (citations omitted) *accord Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) ("A court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion.").

Here, Defendant requests the Court take judicial notice of several documents.  (ECF No. 28-2.)  First, STA requests the Court take judicial notice of the contract at issue in this case—the same contract Sahel claims STA breached.  (ECF No. 28-4, Ex. 1).  As STA notes, this contract was previously submitted and authenticated in relation to the parties' briefing on a prior motion, and courts may take judicial notice of their own files and records.   *See Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1034 (C.D. Cal. 2015) (collecting authorities).   Accordingly, the Court takes judicial notice of STA's Exhibit 1.  (ECF No. 28-4, Ex. 1).

The emails found in Exhibits 2 through 10 are central to Plaintiff's claims as they show what was communicated between the two parties during and after contract negotiations.  Furthermore, their authenticity is uncontested.  Therefore, the Court takes judicial notice of Exhibits 2 through 10, (ECF Nos. 28-5 to 28-13).  *See Perkins v. Linkedin Corp.*, 53 F. Supp. 3d 1222, 1242 (N.D. Cal. 2014) (taking judicial notice of an uncontested screenshot of an email).

23cv1458

Because courts may consider documents that are public records, the Court shall also take judicial notice of Defendant's Exhibit 11, a complaint filed by Plaintiff against Latitude Pharmaceuticals, Inc. in state court in March of last year. (ECF No. 28-14.)

Accordingly, Defendant's request for judicial notice as to all of its proposed exhibits is **GRANTED**. (ECF No. 28-2.)

## III. LEGAL STANDARD

STA brings this motion pursuant to Federal Rule of Civil Procedure 12(b)(6), which allows a party to seek to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

A court "need not assume the truth of legal conclusions cast in the form of factual allegations." *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986). While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Ultimately, a court may not dismiss a complaint in which the plaintiff has alleged enough facts to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 697 (quoting *Twombly*, 550 U.S. at 570). Only where a plaintiff fails to "nudge[ ] [his or her] claims . . . across the line from conceivable to plausible[,]" is the complaint properly dismissed. *Iqbal*, 556 U.S. at 680. While the plausibility requirement is not akin to a probability requirement, it demands more than "a sheer possibility that a defendant has

acted unlawfully." *Id.* at 678.   The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

When a court dismisses a complaint, it must then decide whether to grant leave to amend.   Under Rule 15(a)(2), granting leave to amend rests within the trial court's sound discretion.   *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996).   The Ninth Circuit has held that leave to amend should be freely granted.   *See Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990).

## IV.   ANALYSIS

### A.   Economic Loss Rule

STA first argues that Sahel's claims of both fraud and negligent misrepresentation are barred by the economic loss rule.   (MTD at 16–22.)[4]   The Court, however, may swiftly dispose of Defendant's argument.   "Notwithstanding, the economic loss rule, courts in California have allowed misrepresentation claims to proceed." *Augustine v. Talking Rain Beverage Co., Inc.*, 386 F. Supp. 3d 1317, 1331 (S.D. Cal. 2019) (citations omitted) (permitting a negligent misrepresentation claim pertaining to defendant's alleged misrepresentations in connection with defendant's product to proceed past the motion to dismiss stage).   Courts have similarly allowed fraud claims to proceed.   *See Young v. Neurobrands, LLC*, No. C 18-05907 JSW, 2019 WL 13247942, at *16 (N.D. Cal. Feb. 19, 2019) (finding the economic loss rule did not bar claims where the plaintiffs alleged they were fraudulently induced into a contract).   In line with these decisions, this Court finds that dismissal of neither Plaintiff's fraud nor negligent misrepresentation claim is warranted under this principle.

---

[4] STA states in its Reply that Sahel failed to defend against this argument in its Response and thus the Court may deem the argument conceded.   However, a court generally has discretion to consider even a waived argument.   *See In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1007 (9th Cir. 2008) (exercising its discretion to review a waived claim).   Therefore, the Court will consider this one.

23cv1458

Defendant also argues that the economic loss rule bars Plaintiff's claim for conversion, citing to several unreported district court cases in support. (MTD at 8:11–21.) Whether the economic loss rule bars a conversion claim turns on "whether the ownership interest that formed the basis for the conversion claim preexisted the contract or arises from the contract. Where the interest preexisted the contract, a conversion claim will lie." *Fine v. Kansas City Life Ins. Co.*, 627 F. Supp. 3d 1153, 1161 (C.D. Cal. 2022) (citing *Expedited Packages, LLC v. Beavex Inc.*, No. 15-00721, 2015 WL 13357436, at *4 (C.D. Cal. Sept. 10, 2015)).

In *Fine*, the court upheld a conversion claim where the plaintiff paid premiums on a life insurance policy sold by the defendant. *See Fine v. Kansas City Life Ins. Co.*, 627 F. Supp. 3d 1153, 1156–57 (C.D. Cal. 2022). In that case, the court determined that the plaintiff had a preexisting ownership interest in the premiums paid to the defendant. *See id.* at 1162. Similarly, here, Plaintiff had a preexisting ownership interest in the funds it paid to Defendant pursuant to the contract—the funds were its own—and thus Plaintiff's claim for conversion is not barred by the economic loss rule.

Accordingly, the economic loss rule bars none of Plaintiff's claims.

## B.   Fraud, Negligent Misrepresentation, the Parol Evidence Rule

### 1.   The Parol Evidence Rule

Defendant avers the parol evidence rule bars Plaintiff from employing facts from outside the contract itself to demonstrate Defendant's fraud or negligent misrepresentation. (MTD at 15:3–17:5.) Unless Sahel seeks to invalidate the agreement altogether, STA claims the parol evidence rule bars Sahel from referencing pre-contract statements and representations as evidence of fraud or negligent misrepresentation. (*Id.* at 16:11–24.)

Broadly, the parol evidence rule "prevents the introduction of extrinsic evidence to vary, alter, or contradict the terms of a written agreement." *IIG Wireless, Inc. v. Yi*, 231 Cal. Rptr. 3d 771, 783 (Cal. Ct. App. 2018). Where it comes to questions of fraud or negligent misrepresentation attacking the terms and validity of a contract as written, the parol evidence rule does not bar extrinsic evidence. *See id.* at 785 (stating that the parol

evidence rule exception for fraud or negligent misrepresentation cannot by limited to cases "only where the validity of the agreement is at issue, which would limit it to breach of contract cases seeking to rescind the agreement."  (discussing *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Assn.*, 291 P.3d 316 (Cal. 2013))).

Because Sahel alleges STA committed fraud or negligent misrepresentation when it made statements concerning the parties' contract, the parol evidence rule thus does not bar the Court from considering statements and actions by the parties that are extrinsic to the explicit terms of the contract itself.

### 2.    STA's Statements

In analyzing the sufficiency of the FAC, then, federal courts apply Rule 9(b)'s heightened pleading standard when it comes to fraud.  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).  "Rule 9(b) demands that the circumstances constituting the alleged fraud be 'specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.'"  *Id.* at 1124 (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001).  "This means that allegations of fraud must be stated with 'specificity including an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'"  *SVGRP LLC v. Sowell Fin. Servs., LLC*, No. 5:16-cv-7302-HRL, 2017 WL 1383735, at *4 (N.D. Cal. Apr. 18, 2017) (quoting *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007)).[5]  Defendant avers that the FAC

---

[5] Defendant argues that there are additional pleading requirements for a "corporate defendant" and cites to authority from the Northern District of California as support.  (ECF No. 28 at 10:4–8 (citing *Flowers v. Wells Fargo Bank, N.A.*, No. C 11–1315 PJH, 2011 WL 2748650, at *6 (N.D. Cal. July 13, 2011)).)  The Court notes that *Flowers* cited to a California Court of Appeal case.  *See Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal. App. 4th 153, 157 (1991).  The relevant state court decision specifies additional requirements for pleading fraud against a corporation under California law.  *Id.* (collecting cases).  However, the Ninth Circuit has held "that Rule 9(b)'s particularity requirement applies to state-law causes of action," and that "the Rule 9(b) requirement that the *circumstances* of the fraud must be stated with particularity is a federally imposed rule."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003) (quoting *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985)).  As a result, the Court does not consider California's specificity requirements in determining the sufficiency of Plaintiffs' Complaint under Rule 9(b).  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

does not plead allegations regarding Defendant's fraud with the level of specificity required by Rule 9(b).  The Court thus analyzes whether Plaintiff pleads fraud with sufficient specificity as to each statement alleged in the FAC.

"A cause of action for fraud requires proof of five elements: (1) misrepresentation; (2) knowledge of the statement's falsity; (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Body Jewelz, Inc. v. Valley Forge Ins. Co.*, 241 F. Supp. 3d 1084, 1091 (C.D. Cal. 2017) (quoting *Hunter v. Up-Right, Inc.*, 6 Cal. 4th 1174, 1184 (Cal. 1993)); *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (Cal. 1996).

"[T]o qualify as a misrepresentation, the complaint must allege facts sufficient to plausibly establish that the statement was false when made." *Muse Brands, LLC v. Gentil*, No. 15-cv-01744-JSC, 2015 WL 4572975, *4 (N.D. Cal. July 29, 2015) (citing *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994)). A plaintiff cannot rest a claim of fraud on a statement that later turned out not to be true, but rather must plead and show that an alleged statement was false or misleading when made.  *See In re Clearly Canadian Sec. Litig.*, 875 F. Supp. 1410, 1421 (N.D. Cal. 1995).  The two sets of misrepresentations at issue in this case concern the (1) timing of the drug manufacturing process; and (2) the quality of the first batch of the drug, and whether that first batch would be available for compassionate use to a human patient.

The timing.  The FAC alleges that STA intentionally misrepresented it would be able to begin work on production of the new drug immediately and that it would be ready for compassionate use on Sahel's human patient within two to three months.  (FAC ¶ 11.) Sahel claims one of STA's project managers, Grace Yin, confirmed this in an email stating: "We can target to produce the tox batch within 2-3M assuming we start our work immediately in early of June." (*Id.* ¶ 13.)   STA's head project manager, Lynne Faust, allegedly also wrote in a May 17, 2023, email that STA would be "able to immediately start this program." (*Id.* ¶ 17.)  Sahel points to STA's later inaction to show that these statements were knowingly false when made by Faust and Yin (*id.* ¶ 16), but Sahel cannot rest its claim of fraud on a statement that later turned out not to be true, but rather must

23cv1458

plead and show that an alleged statement was false or misleading when made, *see In re Clearly Canadian Sec. Litig.*, 875 F. Supp. 1410, 1421 (N.D. Cal. 1995).  Further, that a company can target a certain deadline is not a statement that a company may meet that deadline—Yin's statement about how long manufacture would take cannot therefore be a misrepresentation.  Ultimately, Plaintiff has made no such allegations here and as such has insufficiently alleged fraud as to STA's representations about the timing of drug manufacture.

Quality of the first drug batch.  Second, Sahel alleges STA misrepresented the potential use of the first batch of the drug by stating it would be eligible for compassionate use on the human patient Sahel was treating.  First, Sahel's FAC expresses some confusion about whether the misrepresentations were in relation to which line the first batch would be produced on or whether the GLP line, the one named in the contract, would produce an initial batch of sufficient quality for use on Sahel's patient.

While Sahel admits that the contract states the first batch "would be produced under GLP conditions," Sahel alleges that STA misled it to believe that was not the case, that the contract did not reflect the actual agreement between the parties, and it was therefore reasonable for Sahel to rely on STA's representations that the first batch would be produced under GMP conditions.  (FAC ¶ 15.)  Sahel's argument stems from several statements made by STA staff before Sahel signed the contract with STA.  Sahel alleges that during this time STA misrepresented that "the first batch would be made on STA's GMP line so that the samples would be sterile and therefore suitable for human Compassionate Use."  (*Id.* ¶ 14.)  Sahel further alleges STA confirmed this misrepresentation via an email from Yin on May 22, 2023, stating that the first batch would be "produced on our GMP line for sure."  (*Id.*)

At the same time that Sahel alleges it was misled to believe the initial batch would be produced on the GMP line, it also alleges STA misled Sahel to believe that the initial batch would be produced on the GLP line, but it was irrelevant because the GLP line's production would be of sufficient quality to serve Sahel's human patient.  Specifically, the

23cv1458

FAC states that in response to an April 2023 email from Sahel expressing concern about which line would produce a batch sufficient for compassionate use on a human patient, STA project manager Ming Zhang responded more than a month later, stating:

> Based on my previous experience, GMP is not required for investigator-initiated study.  I worked on an investigator-initiated study when I was with my previous company.  We just had a compound pharmacy to make some drug product for human use.  It was not under GMP and the drug products were in R&D lab.  We just ensured it is sterile.

(*Id.* ¶ 16.)  Sahel's FAC further alleges that STA's head project manager, Faust, also responded more than a month later to say, "[w]e are able to immediately start this program and I can confirm this contract replaces the earlier one we shared with you for the GLP only.  This contract will allow us to move forward with the feasibility and the engineering batch will also be the GLP lot for your most immediate needs and then we will start the clinical manufacturing."  (*Id.* ¶ 17.)

From these allegations, it is clear that Sahel received contradictory missives from various STA employees: some stating that the first batch of the drug would be produced on the GLP line, other on the GMP line.  The contract clearly states, however, that the first batch would be made on the GLP line.  Therefore, Sahel's misunderstanding could not stem from whether the first batch would come from the GLP or the GMP line—the misunderstanding would be whether an initial GLP-produced batch could be eligible for compassionate use on Sahel's human patient.  While STA's staff's statements on the subject may constitute misrepresentations, Sahel was not justified in relying upon them, as is further explained below.

STA's ability to source the active pharmaceutical ingredient.  Somewhat coupled with the first alleged misrepresentation regarding STA's capacity to complete the project, the FAC claims Defendant committed fraud with regard to its promises about the sourcing of the required active pharmaceutical ingredient.  The FAC alleges that "STA represented to Sahel it would source the required [active pharmaceutical ingredient] for the manufacture of the new drug in 8 weeks or less."  (FAC ¶ 12.)  The FAC specifies that

23cv1458

STA made these statements "in meetings and conferences occurring on April 12, 2023, and others in April and May of 2023 that there would be no problem in sourcing the [active pharmaceutical ingredient]." (*Id.*) The FAC further states that "Dr. Nezami, Sahel's principal, and Sadia Shauka, a Sahel consultant, with the STA's project team" attended these meetings. (*Id.*) These allegations meet the requirements of the who, when, where, and how, for the purposes of satisfying Rule 9(b). *See United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1181 (9th Cir. 2016) (finding the complaint sufficient where it contained allegations that companies were committing specific acts that constituted fraud, without stating which company employees did or said what). Thus, Plaintiffs have alleged that STA stated it would be able to source the active pharmaceutical ingredient and begin production within eight weeks of signing the contract.

Plaintiff alleges this representation was false when STA made it because STA's later reasons for why it could not source the necessary ingredient were false—something Sahel seems to allege indicates a cover-up. The FAC states that because STA quoted a wildly inaccurate and exorbitant price for the cost of this active pharmaceutical ingredient, it demonstrates STA was covering its tracks—that it never could make the drug but it tried to make the excuse that the ingredient was too expensive as a way to avoid performance on the contract. (*See id.* ¶ 30 (alleging STA "made promises that it knew it could not keep").) Plaintiff further states that STA at the time "did not have access to the [active pharmaceutical ingredient] or did not know where to find it." (*Id.* ¶ 35.) Plaintiff further points to how STA had not sourced or purchased the active pharmaceutical ingredient as of the writing of the FAC. (*Id.*) Therefore, Plaintiff successfully alleges a plausible claim that Defendant made misrepresentations it knew to be false when it made claims about its ability to source the active pharmaceutical ingredient.

### 3.   Justifiability of Plaintiff's Reliance

Reliance is justifiable where "circumstances were such to make it *reasonable* for the plaintiff to accept the defendant's statements without an independent inquiry or investigation." *OCM Principal Opportunities Fund, LP v. CIBC World Markets Corp.*, 68

Cal. Rptr. 3d 828, 856 (Cal. Ct. App. 2007), *as modified* (Dec. 26, 2007) (citation omitted). "The reasonableness of the plaintiff's reliance is judged by reference to the plaintiff's knowledge and experience." *Id.* (citing 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts § 808, at p. 1164).

As noted in this Court's prior order, "the [contract] does not require STA to immediately manufacture a drug batch for human injection. The contract includes many prerequisite steps, including a toxicology and engineering batch that must be completed before the GMP batch. Plus, although the parties offer competing interpretations of the agreement's timeline, it makes no difference. The contract notes the timeline is 'tentative.'" (ECF No. 11 at 6:14–19 (citation omitted).)

STA argues that Sahel's reliance on the misrepresentations above as to the timing of the process and the acquisition of the active pharmaceutical ingredient was "*per se* unjustifiable" given that the FDA regulations for compassionate use trials were publicly available and Sahel itself alleged that it had eight years' experience in clinical trials and experimental therapeutics. (MTD at 11:17–12:14 (quoting FAC ¶¶ 5–6).)

Moreover, this Court takes judicial notice of Sahel's prior complaint, filed against a separate company months before Sahel entered into its contract with STA, stating that Sahel alleged plans to seek FDA approval of a drug before its use in humans, indicating Sahel understood FDA approval to be required before human use. (ECF No. 28-14, Ex. 11 ¶ 27.) In this prior complaint, Sahel states that it "seeks clinical trials with the goal of developing effective drugs that can be submitted to the Food and Drug Administration ("FDA") for approval." (ECF No. 28-14 ¶ 8.) In that same complaint, Sahel shares its understanding of the drug development process as follows:

> Before a drug can be tested in people, the drug company or sponsor perform laboratory and animal tests to discover how the drug works and whether it is likely to be safe and work well in humans. Next, a series of tests on humans begins to determine whether the drug is safe when used to treat a disease and whether it provides a real health benefit.

(*Id.* ¶ 9.)

- 15 -

Ultimately, this Court finds Sahel's reliance unjustifiable. It would be unjustifiable for Sahel to rely on STA's statements as above when, as Sahel itself has stated, so much was on the line and it already had experience with the novel drug production process, including an understanding that the FDA requires laboratory and animal tests prior to administering novel drugs on humans. Because justifiable reliance is also an element of a claim of negligent misrepresentation, and the statements for which Plaintiff alleges Defendant committed negligent misrepresentation are the same as those for Plaintiff's fraud claim, *Body Jewelz*, 241 F. Supp. 3d at 1091 (citing *Fox v. Pollack*, 181 Cal. App. 3d 954, 962 (Cal. Ct. App. 1986)), Plaintiff fails to successfully allege both fraud and negligent misrepresentation on the part of STA.

Having thus determined Sahel's claims for fraud and negligent misrepresentation cannot survive, the Court shall not consider Defendant's arguments related to the non-reliance clause of the contract. (*See* ECF No. 28 at 14:15–17:5.)

### C.   Breach of Written Contract

Sahel in its FAC alleges that STA breached the terms of the contract in five separate ways: (1) by failing to source the active pharmaceutical ingredient within eight weeks, (2) by failing to "share any information regarding the [active pharmaceutical ingredient] and excipients, and failing to obtain any approval regarding such compounds and/or ingredients;" (3) by failing to update Sahel on the progress of the project; (4) by failing to provide written updates ahead of meetings; and (5) by advertising Sahel's technology to obtain other clients. (FAC ¶ 48.a–e.) In challenge, STA attaches the contract itself to its Motion to Dismiss.

To state a claim for breach of contract under California law, plaintiffs must plead four elements: (1) the existence of a contract, (2) plaintiffs' performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to the plaintiffs as a result of that breach. *Misha Consulting Grp., Inc. v. Core Ed. & Consulting Solutions, Inc.*, No. C-13-04262-RMW, 2013 WL 6073362, at *1 (N.D. Cal. Nov. 15, 2013) (citing *CDF Firefighters*

*v. Maldonado*, 70 Cal. Rptr. 3d 667, 679 (Cal. Ct. App. 2008), *as modified on denial of reh'g* (Feb. 5, 2008)).  There is no dispute that a contract existed and that Sahel completed at least partial performance.  The core of STA's challenge to Sahel's breach of contract claim rests on whether STA breached the contract.

Breach 1: Failing to source the active pharmaceutical ingredient within eight weeks. Sahel claims STA breached the contract by "[f]ailing to source or make the [active pharmaceutical ingredient] available within 8 weeks."  (FAC ¶ 48.a.)  STA moves to dismiss on the grounds that "[t]he unambiguous terms of the Contract demonstrate that STA was not required to source or make the [active pharmaceutical ingredient] available within eight weeks as Plaintiff alleges."  (MTD at 17:20–22.)  Plaintiff attempts to survive the motion to dismiss by alleging the contract was ambiguous as to who was to source the active pharmaceutical ingredient and what the contract intended by the term "raw materials."  (Resp. at 13:28–14:2, 14:17–20.)

Interpretation of contracts is a matter of law and appropriate to address at the motion to dismiss stage, but where there is ambiguity in the meaning of a contract's provision(s), the court must deny the motion to dismiss.  *Gerlinger v. Amazon.com, Inc.*, 311 F. Supp. 2d 838, 843 (N.D. Cal. 2004) (citing *Atel Fin. Corp. v. Quaker Coal Co.*, 321 F.3d 924, 925–26 (9th Cir. 2003)); *Monaco v. Bear Stearns Residential Mortg. Corp.*, 554 F. Supp. 2d 1034, 1040 (C.D. Cal. 2008); *see also Trs. of Screen Actors Guild-Producers Pension & Health Plans v. NYCA, Inc.*, 572 F.3d 771, 777 (9th Cir. 2009).  In interpreting a contract, unless the contract uses words in a technical manner or defines certain terms, the words of a contract are understood in their ordinary and popular sense.  *See Britz Fertilizers, Inc.*, 665 F. Supp. 2d 1142, 1159–60 (citing *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 135 Cal. Rptr. 2d 505, 513 (Cal. Ct. App. 2003)).  Although a contract is ambiguous if it is capable of two different reasonable interpretations, a court will not strain to create an ambiguity where none exists.  *See Kashmiri v. Regents of the Univ. of Cal.*, 67 Cal. Rptr. 3d 635, 660 (Cal. Ct. App. 2007), *as modified* (Nov. 15, 2007), *as modified* (Nov. 28, 2007) ("[L]anguage in a contract must be

interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract.") (quoting *Waller v. Truck Ins. Exchange, Inc.*, 900 P.2d 619, 627 (Cal. 1995), *as modified on denial of reh'g* (Oct. 26, 1995)).

Plaintiff argues that "the contract, at best, is ambiguous as to who was to source the [active pharmaceutical ingredient]." (Resp. at 14:17–20.)  However, the language of the contract is quite clear and not self-contradictory.  STA is intended to source the raw materials for the project, subject to Sahel's approval.  Specifically, Sections 4.1.2(1) and 4.1.1(1), which govern various assumptions of the contract, supplement one another without contradiction.  Section 4.1.1 titled "General Assumptions" provides that STA will source and purchase the required materials.  Section 4.1.2, titled "Raw Material & Tooling Assumptions," states that STA "will be responsible for sourcing all raw materials from suppliers approved (suggested by) Sahel."  While Section 4.1.2 adds a requirement that Sahel have approval authority, there is no ambiguity that STA is in charge of sourcing all materials.  The Court would be straining if it were to conjecture that the provisions, read together, could mean Sahel was in charge of sourcing the materials to produce the drug.  Therefore, the Court finds the contract unambiguous as to the requirement that STA source the raw material.

Second, it is unambiguous as to what "raw materials" refers.  Plaintiff aims to survive the motion to dismiss by alleging the contract was ambiguous as to what the contract intended by the term "raw materials." (Resp. at 13:28–14:2.)  Plaintiff claims it is unclear that "raw materials really meant [active pharmaceutical ingredient] and excipients." (Resp. at 14:1–2.)  However, Plaintiff does not offer an alternative reasonable interpretation of the term, and the ordinary sense of "raw materials" in the context of the contract as a whole, clearly means the raw materials to manufacture the drug the parties contracted for.  Therefore, the Court finds the contract unambiguous as to what the term "raw material" refers.

Having concluded the contract is unambiguous as to the provisions at issue in breach 1, the Court proceeds with the analysis of whether Sahel plausibly pleads STA

breached the contract by failing to source the active pharmaceutical ingredient within the eight weeks.  The Court reiterates its finding in its order on the TRO that the unambiguous terms of the written contract do not require STA to immediately source the active pharmaceutical ingredient at all costs and the timeline provided in the contract is explicitly "tentative." (*See* ECF No. 11 at 6:4–7:4.)  Therefore, that STA did not source the active pharmaceutical ingredient within eight weeks was not a breach of the contract and Plaintiff fails to plausibly allege a claim for breach of contract under breach 1.

Breach 2: STA failed to share information regarding the active pharmaceutical ingredient or excipients.  Sahel claims STA breached the contract by failing to "share any information regarding the active pharmaceutical ingredient and excipients, and failing to obtain any approval regarding such compounds and/or ingredients." (FAC ¶ 48.b.)  STA responds that its conduct did not constitute breach because "Sahel admits that STA held a project meeting and presented a proposal to Sahel for its approval.  Sahel refused to agree to the proposal but clearly admits STA shared the information regarding the active pharmaceutical ingredient in an attempt to obtain Sahel's approval as required by the Contract." (MTD at 18:5–9.)  Indeed, upon the facts as pled, taken as true, the Court finds Plaintiff fails to state a plausible claim for breach of contract on these grounds.  While it does not appear that the FAC contradicts itself, it does fail to state sufficient facts to allege such a breach.  For instance, it fails to allege any facts such as unanswered emails, communications in meetings, or anything else to suggest that STA has failed to provide any information or that it has failed to obtain any approval.  Rather, Sahel simply states that it has failed to do so and thus has breached, but Sahel fails to indicate how it knows this to be the case or any actions taken on its part to confirm compliance.  This amounts to exactly the kind of "the-defendant-unlawfully-harmed-me accusation" that cannot  survive the motion to dismiss stage, *see Iqbal*, 556 U.S. at 678, because it offers mere "labels and conclusions" rather than facts, *Twombly*, 550 U.S. at 555.  Accordingly, Sahel fails to plausibly allege a claim for breach of contract under breach 2.

Breach 3: Failing to provide Sahel with updates on project progress.  The Court finds Sahel sufficiently pleads facts in support of breach 3, STA's failure to update Sahel on the progress of the project.  (FAC ¶ 48.c.)  The contract at 5.2 states: "Progress on this project is reported to Sahel Oncology LLC as part of regularly-scheduled project team meetings (frequency to be determined at project initiation)."  While Plaintiff does not plead any facts indicating the decided-upon frequency of the project team meetings, Sahel does plead that STA has "refused to provide such progress" updates.  At this stage of the proceedings, Sahel's claim as to breach 3 thus survives.

Breach 4: Failing to provide written updates prior to team meetings.  Also, the Court disagrees with STA that Sahel has failed to allege facts in support of its claim that STA did not "provide written updates prior to each team meeting" as the contract requires.  (FAC ¶ 48.d.)  The contract requires that STA provide written updates prior to team meetings and Sahel alleges STA has not done that.  Such assertions are sufficient at this stage in proceedings for Sahel's claim as to breach 4 to survive.

Breach 5: Advertising Sahel's technology on STA's website.  Defendant makes the same argument as to breach 4 but it necessarily fails where Plaintiff alleged that Defendant was advertising Plaintiff's technology on its website, in contravention of the contract, and therefore that constituted breach.  (FAC ¶ 31.)  This constitutes sufficient factual allegations to state a plausible claim at this stage of the case and therefore the motion to dismiss will be denied as to the claim for breach 5 of the contract.

### D.   Conversion

Plaintiff alleges a claim for conversion by stating STA "wrongfully obtained and maintains the [initial deposit] paid by Sahel," causing Sahel damage as a "proximate result of such conversion."  (FAC ¶¶ 52–53.)  Sahel further requests "punitive and exemplary damages" for this claim because "[t]he conduct of STA is despicable, fraudulent, and shows a conscious disregard for the rights of Sahel and its patients."  (Id. ¶ 54.)

The elements of a claim for conversion are (1) the plaintiff's ownership or right to possession of the property at the time of the conversion, (2) the defendant's conversion by

a wrongful act or disposition of property rights, and (3) damages." *Prakashpalan v. Engstrom, Lipscomb & Lack*, 167 Cal. Rptr. 3d 832, 857 (Cal. Ct. App. 2014), *as modified on denial of reh'g* (Feb. 27, 2014) (citing *Farmers Ins. Exchange v. Zerin*, 53 Cal. App. 4th 445, 451 (Cal. Ct. App. 1997).)  "A mere contractual right of payment, without more, will not suffice." *Cakebread v. Berkeley Millwork & Furniture Co.*, No. 16-CV-00083-RS, 2017 WL 579913, at *8 (N.D. Cal. Feb. 13, 2017) (citing *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 233 (Cal. Ct. App. 2014)).  "[T]he simple failure to pay money owed does not constitute conversion . . . . Were it otherwise, the tort of conversion would swallow the significant category of contract claims that are based on the failure to satisfy mere contractual right[s] of payment." *Beluca Ventures LLC v. Aktiebolag*, 622 F. Supp. 3d 806, 814 (N.D. Cal. 2022) (citing *Voris v. Lampert*, 446 P.3d 284, 291 (Cal. 2019)).

STA argues Sahel fails to state a claim for conversion because Sahel fails to plausibly allege the first element of conversion—that Sahel has an ownership right to the money Sahel deposited with STA.  (MTD at 22:5–23:3.)  Indeed, whether Sahel sufficiently pleads this claim turns on whether it was "entitled to immediate possession" of the property at the time of conversion. *Bastanchury v. Times-Mirror Co.*, 68 Cal. App. 2d 217, 236 (Cal. Ct. App. 1945).

Here, Sahel does not plead sufficient facts as to the time of conversion, but it is irrelevant because once Sahel deposited funds in STA's account, Sahel was no longer entitled to immediate possession of the property at any point. *See In re James E. O'Connell Co.*, 799 F.2d 1258, 1261 (9th Cir. 1986) (affirming a district court holding that the defendants' refusal to return plaintiff's deposit following defendants' anticipatory breach of contract to convey title to real and personal property constituted conversion); *Schneider v. Bank of Am. N.A.*, 2014 WL 2118327, at *13 (E.D. Cal. May 21, 2014) (holding that an allegation that the defendants refused to return to the plaintiffs any portion of funds the plaintiff entrusted to the defendant for the purpose of crediting the plaintiff's mortgage account, even after fees the defendant claimed to be owed were deducted, constituted a

viable claim for conversion).  The contract makes clear that the funds in the instant case were not to be transferred to an escrow account and were not otherwise entrusted to Defendant on some temporary basis.  (*See generally* ECF No. 28-4.)  Rather, the contract specifically requires the initial deposit was to be transferred directly to an account in STA's name.  (ECF No. 28-4, Ex. 1, at 0006 (requiring the initial payment to be paid into an account where the beneficiary is explicitly "STA Pharmaceutical Hong Kong Limited.")

Further, Plaintiff fails to plead facts that do more than "merely restate contractual obligations," and thus fails to state a claim to recover for the tort of conversion.  *Nguyen v. Stephens Inst.*, 529 F. Supp. 3d 1047, 1058 (N.D. Cal. 2021) (citation omitted).  Plaintiff has done no more than claim that STA failed to pay money the contract states STA owes Sahel.  The California Supreme Court has held such claims cannot constitute conversion because otherwise "the tort of conversion would swallow the significant category of contract claims that are based on the failure to satisfy mere contractual right[s] of payment."  *Voris*, 446 P.3d at 291 (citations omitted).  Sahel claims that because Sahel was "lured into the contract" via "fraudulent representations and promises," it has stated a claim for conversion.  (Resp. at 16:2–11.)  However, Sahel cites to no cases in support of this proposition and this Court has found none—further, as described above, Sahel has failed to state such a claim for fraud or even negligent misrepresentation.  As such, this argument must necessarily fall.

Therefore, Plaintiff fails to state a claim for conversion.

### E.      Equitable Estoppel

The FAC includes a claim for declaratory relief under the California principle of equitable estoppel, California Evidence Code Section 623.  (FAC ¶ 56.)  Plaintiff seeks to estop STA "from relying on the terms of the contract as they contradict STA's express promises and representations and Sahel relied on those promises and representations to sign the contract."  (*Id.* ¶ 57.)  Sahel alleges that because STA wishes to apply the express language of the contract and Sahel wishes to apply the terms as indicated by STA's promises and conduct, "an actual controversy has arisen between the Sahel and STA such

- 22 -

that Sahel seeks a declaration from the Court as to the parties' rights on this matter." (*Id.* ¶¶ 58–59.)

Defendant attempts to dismiss this claim, arguing it is duplicative of Plaintiff's breach of written contract and fraud claims. (MTD at 23:6–18.) Defendant's argument must fail, though, in the face of the Federal Rules of Civil Procedure. A plaintiff "may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3); *see also Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1368 (Fed. Cir. 2009), *on reh'g in part,* 638 F.3d 781 (Fed. Cir. 2011) ("It cannot be understood as precluding a party from alleging in the same complaint two alternative theories for recovery against the [defendant], for example, one for breach of contract and one for a taking under the Fifth Amendment to the Constitution. That is expressly permitted by the Federal Rules, and the fact that the theories may be inconsistent is of no moment."). The reported cases STA cites in support of its argument are inapposite because the opinions stem not from motions to dismiss, but from final judgments. *See, e.g.*, *Tyler v. Travelers Com. Ins. Co*., 499 F. Supp. 3d 693, 702 (N.D. Cal. 2020) (granting a motion for judgment on the pleadings); *United States v. Washington*, 759 F.2d 1353, 1356–57 (9th Cir. 1985) (reviewing a district court's grant of declaratory judgment).

Because a plaintiff may plead duplicative claims at this stage in the case, Sahel's claim for equitable estoppel necessarily survives as it relates to Plaintiff's surviving breach of contract claims.

## F.    Unconscionability of the Limitations on Liability Provision

Further, Sahel petitions the Court to declare one provision of the contract unconscionable. The provision is in an attachment to the contract and is labeled "Limitations on Liability." (ECF No. 28-4 at 0018.) Sahel seeks a determination and declaration by the Court that this Limitations on Liability provision within the contract is unconscionable and unenforceable. (*Id.* ¶¶ 60–66.) The provision reads as follows:

> **9.4 Limitations on Liability** (a) Except for Losses arising from
> a Party's breach of confidentiality obligations or from a Party 's

gross negligence or willful misconduct, neither Party nor any of their respective Affiliates or any of their respective directors, officers, employees or agents, shall have any liability to the other Party for any punitive, multiple, special, incidental, indirect or consequential damages, or for damages for the loss of business, anticipated savings, opportunity, use, revenue or profit, reputation or financing, in connection with or arising out of this Agreement or any activities carried out under this Agreement regardless of whether an action is brought in tort, contract or any other theory, (b) Except for Losses arising from Provider's breach of confidentiality obligations or from Provider's gross negligence or willful misconduct, Provider's maximum aggregate total liability in connection with the Agreement will not exceed the total payments of Service Fees received for the affected Services under the Agreement from which the liability arises. (c) Subject to the limitations set forth in this Section 9.4, in the event that the Provider commits a breach of the obligation set forth in Section 4.1 above, Provider's sole liability, and Client's sole remedy shall be for Provider to conform, at Provider's cost and expense , the affected work or portion of the Services affected by the breach to the relevant specification. Notwithstanding the foregoing, (i) unless the breach is solely caused by gross negligence or willful misconduct of Provider, the cost covered by Provider under this Section 9.4(c) shall not include the cost of any Materials; and (ii) with regards to any Services that involve using a Client Material, the cost covered by Provider under this Section 9.4(c) shall not include the cost of such Client Material under any circumstances.  (d) Nothing in this Agreement shall limit or exclude a Party's liability for any liability which cannot be limited or excluded by Applicable Law.

(ECF No. 28-4 at 18.)

As Sahel notes, the provision is "single spaced and in small type," like the other provisions in the attachment.  (FAC ¶ 61.)  Sahel alleges the Limitations on Liability provision, like each of the provisions in the Standard Terms and Conditions attachment, was "presented on a take it or leave it basis," and that the Limitations on Liability provision was "buried" in this attachment.  (*Id.* ¶¶ 62–63.)  Plaintiff alleges in the FAC that Sahel sought to include various requirements in the contract but was denied by STA saying, "that

- 24 -

this was its standard form contract, and that STA could not change it, and Sahel needed to sign it in the form presented."  (*Id.* ¶ 19.)

Under California law, a contract must be both procedurally and substantively unconscionable to be rendered invalid.  *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 690 (Cal. 2000).  The measure of unconscionability is taken on a "sliding scale"—the less procedurally unconscionable a contract is, the more substantively unconscionable it must be and vice versa.  *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 922 (9th Cir. 2013).  "The ultimate issue in every case is whether the terms of the contract are sufficiently unfair, in view of all relevant circumstances, that a court should withhold enforcement."  *OTO, L.L.C. v. Kho*, 447 P.3d 680, 690 (Cal. 2019) (citation omitted).

Procedural unconscionability refers to "the manner in which the contract was negotiated and the respective circumstances of the parties at that time, focusing on the level of oppression and surprise involved in the agreement."  *Chavarria*, 733 F.3d at 922 (citing *Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 783 (9th Cir. 2002)).  Absence of choice and unequal bargaining power go to the level of oppression, while "the extent to which the contract clearly discloses its terms as well as the reasonable expectations of the weaker party" go to the level of surprise.  *Id.*  For instance, the court found in *Chavarria* that it was procedurally unconscionable due to oppression where the plaintiff "could only agree to be bound by the policy or seek work elsewhere."  *Id.* at 923.

Here, Plaintiff pleads several facts in favor of a finding of procedural unconscionability.  First, Sahel claims the contract was presented as a take it or leave it contract.  Second, that STA leveraged the intense time pressure Sahel felt to assist its patient to push Sahel into entering into the contract.  And, third, that Defendant misrepresented its capacity to manufacture that drug all point to procedural unconscionability. (Resp. at 18:2–5.)

As discussed above, Plaintiff has not alleged sufficient facts to demonstrate STA's misrepresentations about its capacity to manufacture the drug in the desired time period were ones that Plaintiff could reasonably rely upon.  Further, the plain text of the contract

- 25 -

itself contradicts Plaintiff's assertion that the contract was take it or leave it. The contract has been redlined and modified in its substantive terms, such as an increase in the duration of the confidentiality provision from five to seven years. (ECF No. 28-4 at 0018.) Moreover, Plaintiff does not allege certain other hallmarks of procedural unconscionability such as the lack of representation in its contract negotiations with STA. While Plaintiff notes the Limitations on Liability provision was in small type, its heading was in bold and the provision was formatted in the same way as others that Sahel redlined and modified in the contract. Therefore, Sahel fails to allege procedural unconscionability in connection with the limitations on liability provision.

A contract is substantively unconscionable when it is unjustifiably one-sided to such an extent that it "shocks the conscience." *Chavarria*, 733 F.3d at 923 (quoting *Parada v. Super. Ct.*, 98 Cal. Rptr. 3d 743, 759 (Cal. Ct. App. 2009). It is not enough for the terms of the contract to simply be an "old-fashioned bad bargain." *OTO*, 447 P.3d at 693. The California Supreme Court has held that not all damages limitations in contracts of adhesion are *per se* substantively unconscionable. *Chin v. Advanced Fresh Concepts Franchise Corp.*, 194 Cal. App. 4th 704, 712 (Cal. Ct. App. 2011) (discussing *Armendariz*, 24 Cal. 4th at 113–14). While the Limitations on Liability provision limits damages available to Plaintiff, Plaintiff has not offered facts to show that it is so one-sided as to shock the conscience. That Defendant acted as some sort of fox in the henhouse when it entered into the contract with Plaintiff is implausible based on these facts. Without further facts alleged, Plaintiff fails to allege substantive unconscionability.

In sum, Plaintiff has failed to allege sufficient facts to show procedural or substantive unconscionability to indicate Sahel has stated a plausible claim for relief declaring the Limitations on Liability provision unconscionable.

## V.   CONCLUSION

Accordingly, the Court **GRANTS** Defendant's Request for Judicial Notice. (ECF No. 28-2.) The Court further rules as follows on Defendant's Motion to Dismiss Plaintiff's FAC (ECF No. 28-1):

23cv1458

1.  **GRANTED** as to Plaintiff's fraud and negligent misrepresentation claims;

2.  Breach of contract

     a.  **GRANTED** as to Plaintiff's alleged breach 1;

     b.  **GRANTED** as to Plaintiff's alleged breach 2;

     c.  **DENIED** as to Plaintiff's alleged breach 3;

     d.  **DENIED** as to Plaintiff's alleged breach 4;

     e.  **DENIED** as to Plaintiff's alleged breach 5;

3.  **GRANTED** as to Plaintiff's conversion claim;

4.  Equitable estoppel

     a.  **DENIED** as to Plaintiff's equitable estoppel claim as it relates to Plaintiff's surviving breach of contract claims;

     b.  **GRANTED** as to Plaintiff's equitable estoppel claim as it relates to Plaintiff's dismissed breach of contract claims;

5.  **GRANTED** as to Plaintiff's unconscionability claim.

To the extent the Court dismisses Plaintiff's claims, it does so without prejudice. If Plaintiff wishes to amend the claims herein dismissed, it must do so on or before **July 9, 2024**. If Plaintiff fails to amend, Defendant is ordered to file its response on or before **July 16, 2024**.

**IT IS SO ORDERED.**

**DATED: June 18, 2024**

Hon. Cynthia Bashant
United States District Judge

- 27 -

23cv1458